AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Maine

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Premises at 193 Rowe Road, Skowhegan, Maine 04976, black 2007 Chevrolet Tahoe, white 2012 GMC Yukon and Christopher Kruse further described in Attachment A

)
)
)
)
)
)

U.S. DISTRICT COURT
BANGOR, MAINE
RECEIVED AND FILED

2017 NOV 27  A 10: 23

DEPUTY CLERK

Case No. 1:17-mj-00235-JCN

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Premises at 193 Rowe Road, Skowhegan, Maine 04976, black 2007 Chevrolet Tahoe, white 2012 GMC Yukon and Christopher Kruse further described in Attachment A

located in the _____ District of _____ Maine _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Title 2252A | Transportation of child pornography, distribution and receipt of child pornography, soliciting or promoting child pornography, possession of and access with intent to view child pornography |

The application is based on these facts:
Affidavit of Special Agent Gregory Kelly, Homeland Security Investigations

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Gregory M. Kelly, Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/27/17

_____
*Judge's signature*

City and state:  Bangor, Maine

John C. Nivison, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## OF A SEARCH WARRANT

I, Gregory Kelly, a Special Agent (SA) with Homeland Security Investigations (HSI), being duly sworn, depose and state as follows:

### INTRODUCTION

1.　　　I have been employed as a Special Agent of the U.S. Department of Homeland Security, Homeland Security Investigations (HSI) since 2007, and am currently assigned to the HSI Bangor, Maine office.  Since approximately May 2010, I have been assigned to conduct investigations of crimes where computers and the Internet are used in the sexual exploitation of children, including (but not limited to) violations of 18 U.S.C. Sections 2251 and 2252A, which prohibit a person from knowingly advertising, transporting, receiving, distributing, possessing or accessing with intent to view, in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, child pornography, as defined in 18 U.S.C. Section 2256(8).  I have received formal and on-the-job training in the investigation of cases involving the sexual exploitation of children.  My experience includes participation in the execution of numerous search warrants involving child pornography and seizures of computers and other storage media, and I have participated in numerous arrests and interviews of subjects involved with child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251 and 2252A, and I am authorized by law to request a search warrant.

1

2.      This affidavit is submitted in support of an application for a search warrant for the locations specifically described in Attachment A of this Affidavit, including the entire property located at 193 Rowe Road, Skowhegan, Maine 04976 (the "SUBJECT PREMISES") for contraband and evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2251 and 2252A, which items are more specifically described in Attachment B of this Affidavit.

3.      The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers, my review of documents and computer records related to this investigation, and information gained through my training and experience.  Based on this training and experience, there is probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2251(d) and (e) (advertising child pornography); 18 U.S.C. §§ 2252A(a)(1) and (b)(1) (transportation of child pornography); 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1) (distribution and receipt of child pornography); 18 U.S.C. §§ 2252A(a)(3)(B) and (b)(1) (soliciting or promoting child pornography); and 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography), are presently located at the SUBJECT PREMISES.

## STATUTORY AUTHORITY

4.      As noted above, this investigation concerns alleged violations of the following:

a.      Title 18, United States Code, Sections 2251(d) and (e) prohibit any person from knowingly making, printing, or publishing, or causing to be made, printed, or published, or attempting or conspiring to make, print, publish, or attempt or conspire to

cause to be made, printed, or published, any notice or advertisement seeking or offering to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct; or participation in any act of sexually explicit conduct by or with any minor for the purpose of producing a visual depiction of such conduct.

   b.  Title 18, United States Code, Sections 2252A(a)(1) and (b)(1) prohibit a person from knowingly mailing, or transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography, as defined in 18 U.S.C. § 2256(8), or attempting or conspiring to do so.

   c.  Title 18, United States Code, Sections 2252A(a)(2)(A) and (b)(1) prohibit a person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

   d.  Title 18, United States Code, Sections 2252A(a)(3)(B) and (b)(1) prohibit a person from knowingly advertising, promoting, presenting, distributing, or soliciting through the mails, or using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any material or purported material in a manner that reflects the belief, or that is intended to

3

cause another to believe, that the material or purported material is, or contains an obscene visual depiction of a minor engaging in sexually explicit conduct or a visual depiction of an actual minor engaging in sexually explicit conduct.

     e.    Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

5.    The following definitions apply to this Affidavit and Attachment B:

     a.    "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

     b.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

c.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices.  *See* 18 U.S.C. § 1030(e)(1).

e.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

5

f.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g.      "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

h.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

i.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

j.      "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

k.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

l.      "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

m.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

n.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, THE INTERNET, AND EMAIL

      6.      I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

      a.      Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

      b.      Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner.  Furthermore, with the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera or smartphone to the computer.  In the last ten years, the resolution of pictures taken by digital cameras and smartphones has increased dramatically, meaning that such pictures have become sharper and crisper.  Photos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs.  Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera.  The video files can be easily transferred from the camcorder to a computer.

8

      c.      A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.  The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.  Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem.  Because of the proliferation of commercial services that provide electronic mail service, chat services (*i.e.*, "instant messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

      d.      The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store thousands of images at very high resolution.  In addition, there are numerous options available for the storage of computer or digital files.  One-terabyte external and internal hard drives are not uncommon.  Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage

9

devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them).  Some media storage devices can easily be concealed and carried on an individual's person, in an automobile to which the individual has access, and in outbuildings on an individual's property.  Laptop computers are designed to be portable and are oftentimes carried in an individual's vehicle.  Smartphones and/or mobile phones are also often carried on an individual's person.

      e.      The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

      f.      Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

      g.      As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files).  Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (*e.g.*,

temporary files or ISP client software, among others).  In addition to electronic

communications, a computer user's Internet activities generally leave traces or

"footprints" in the web cache and history files of the browser used.  Such information is

often maintained indefinitely until overwritten by other data.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

7.      Based upon my training and experience and information relayed to me by agents

and others involved in the forensic examination of computers, I know that computer data can be

stored on a variety of systems and storage devices, including external and internal hard drives,

flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards,

cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards,

memory chips, and online or offsite storage servers maintained by corporations, including but

not limited to "cloud" storage.  I also know that during the search of the premises it is not always

possible to search computer equipment and storage devices for data for a number of reasons,

including the following:

a.      Searching computer systems is a highly technical process which requires

specific expertise and specialized equipment.  There are so many types of computer

hardware and software in use today that it is impossible to bring to the search site all of

the technical manuals and specialized equipment necessary to conduct a thorough search.

In addition, it may also be necessary to consult with computer personnel who have

specific expertise in the type of computer, software application, or operating system that

is being searched;

11

b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.

12

Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

8.        Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.  There are several reasons that compel this conclusion:

        a.        The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system.  It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.  In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

        b.        In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU).  Further, the analyst needs all the system software (operating systems or interfaces, and hardware

13

drivers) and any applications software that may have been used to create the data

(whether stored on hard drives or on external media) for proper data retrieval.

9.      Additionally, based upon my training and experience and information related to

me by agents and others involved in the forensic examination of computers, I know that routers,

modems, and network equipment used to connect computers to the Internet often provide

valuable evidence of, and are instrumentalities of, a crime.  This is equally true of so-called

"wireless routers," which create localized networks that allow individuals to connect to the

Internet wirelessly.  Though wireless networks may be "secured" (in that they require an

individual to enter an alphanumeric key or password before gaining access to the network) or

"unsecured" (in that an individual may access the wireless network without a key or password),

wireless routers for both secured and unsecured wireless networks may yield significant evidence

of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument

through which the perpetrator of the Internet-based crime connected to the Internet and,

potentially, containing logging information regarding the time and date of a perpetrator's network

activity as well as identifying information for the specific device(s) the perpetrator used to access

the network.  Moreover, I know that individuals who have set up either a secured or unsecured

wireless network in their residence are often among the primary users of that wireless network.

## PROBABLE CAUSE

10.     On December 3, 2015, I assisted Penobscot County Sheriff's Office Detective

Rick Canarr with an investigation involving allegations of an adult male, later identified as

Christopher Kruse, wanting to have sex with an adult female while her 3 year old daughter was

present and watching.  This allegation was reported by the adult female (hereafter Individual 1)

14

who told investigators she and her boyfriend (hereafter Individual 2) had been looking online for a sex partner when they saw a Craigslist ad seeking a single mom for taboo sex. They responded to the ad and Kruse met them at their home in Bangor, Maine for sex. When Kruse arrived, Individual 1 took her 3 year old daughter to the babysitter's apartment. During sex, Kruse allegedly made statements Individual 1 understood as Kruse wanting to have sex with Individual 1 while her 3 year old daughter watched. Kruse also allegedly offered Individual 1 $200 for the 3 year old to be present while they had sex under the covers while the girl was in the same room. Individual 1 told Kruse she would think about it so he would stop asking. Kruse also allegedly told Individual 2 he had once had sex with a mother and her toddler daughter and described an encounter where he was on his back while the mother performed oral sex on him. The female toddler was on his chest straddling his upper body by the shoulders and he ejaculated onto the toddler's vagina and licked it off while the mother took pictures. Kruse also told Individual 2 he had child pornography on his computer and he would bring it by sometime to show him.

11.    Individual 1 and Individual 2 were concerned by Kruse's sexual interest in children but went along with the conversations. Individual 2 relayed the following additional information about his conversations with Kruse: Individual 2 claimed Kruse asked him how much he would want to be able to have sex with the 3 year old girl and offered Individual 2 $200 to do so. Individual 2 said he didn't think Individual 1 was into that, but that if Individual 1 were drunk she might agree. At this point, Kruse gave Individual 2 $50, which Individual 2 believed to be a down payment for the alcohol to get Individual 1 in the mood. Individual 2 did not agree with Kruse's ideas but went along with the conversation and made up a story of a fictitious mother and child to try and get Kruse interested enough to leave and come back which Individual

15

2 figured would give him enough time to call the police.  Individual 2 told Kruse he knew a

mother named Donna who would probably let Kruse have sex with her 5 year old daughter in

exchange for OxyContin.  According to Individual 2, Kruse left to try and buy some OxyContin

and wanted to return to have sex with either Donna's child or Individual 1's child.  When Kruse

left, neither Individual 1 nor Individual 2 knew Kruse's name, but they knew his phone number

to be 954-650-3413 which was the phone number they had been communicating with in regards

to the Craigslist ad.  Individual 2 showed investigators two text messages he received from this

phone number after Kruse left which read, "They getting worked up?" and "Heading back your

way".

      12.     When Kruse returned later that afternoon as Individual 2 said he would, Detective

Canarr arrested Kruse for the attempted visual sexual aggression against a child.  Detective

Canarr and I interviewed Kruse who told us he lived at 193 Rowe Road in Skowhegan, Maine

and that he owned a store in Norridgewock, Maine.  Kruse claimed to be in Bangor to have sex

with Individual 1 who he had met on Craigslist and to find a replacement bathtub at the Home

Depot.  Kruse claimed the whole incident with Individual 1 and the 3 year old girl was a

misunderstanding.  Kruse had an iPhone 6 in his possession and unlocked it to show us the text

messages between him and Individual 2 that day.  One text he showed us read, "I don't mind her

being there if it's easier for you."  Kruse explained he meant he did not mind if the daughter

were in the house when they had sex, but he had no intention of having her present while they

were having sex.  Kruse denied making any arrangements to have sex with the child or to having

any conversations about doing so that could have been misinterpreted.  Kruse admitted he paid

Individual 1 and Individual 2 $50 each for sex and reasoned they might have made the

allegations up, because they wanted more money.  Kruse also stated he had a Yahoo! email

account that could be accessed from his iPhone, but he was not willing to tell us what the address

was or show us the emails related to this incident.  Detective Canarr held Kruse's cell phone as

evidence pending the investigation into the allegations.  Kruse was processed and released later

that evening.

13.     On December 16, 2015, Detective Canarr applied for and obtained a state search

warrant for Kruse's cell phone.  The phone was unable to be forensically examined as it was

locked and it was impossible to recover any data without the passcode at that time.

14.     Individual 1 and Individual 2 declined to cooperate with the investigation and

charges against Kruse were ultimately dismissed.  The phone remained in evidence at the Bangor

Police Department where it had been sent for the unsuccessful forensic examination.

15.     In September of 2016, I received an investigative referral related to a Skype

account, identified as "Screenname 1"[1], which had been identified by foreign law enforcement as

corresponding with a foreign Skype user, identified as the user of "Screenname 2", who has

since been convicted of possessing/making/distributing indecent images of children.  The chat

between Screenname 1 and Screenname 2 centered on the sexual abuse of children and began in

December 2014 and continued into May 2015. The chat is as follows:

    Screenname 1 (12/31/14 14:29:59): hey
    Screenname 2 (12/31/14 14:37:59): hi
    Screenname 1 (12/31/14 14:38:50): u playin?
    Screenname 2 (12/31/14 14:39:08): with my dick yes!
    Screenname 2 (12/31/14 14:39:10): u?
    Screenname 1 (12/31/14 14:39:23): yes…u active?

---

[1] The actual screennames have been substituted with "Screenname 1" and "Screenname 2" to preserve the integrity of an ongoing investigation.  This naming convention will continue for subsequently referenced screennames.

17

Screenname 1 (12/31/14 14:39:28): active here
Screenname 2 (12/31/14 14:39:38): not active at the moment alas
Screenname 2 (12/31/14 14:39:44): wanna cam?
Screenname 1 (12/31/14 14:39:58): can't at the moment…when gf leaves I can
Screenname 2 (12/31/14 14:40:03): cool
Screenname 1 (12/31/14 14:40:05): horny as hell here though
Screenname 2 (12/31/14 14:40:07): lol
Screenname 2 (12/31/14 14:40:08): same
Screenname 1 (12/31/14 14:40:09): gf has 3 kids
Screenname 2 (12/31/14 14:40:16): who u active with?
Screenname 1 (12/31/14 14:40:16): u?
Screenname 2 (12/31/14 14:40:28): 3yog 10 yb and 12g
Screenname 1 (12/31/14 14:40:32): are her kids
Screenname 1 (12/31/14 14:40:36): mess when sleeping
Screenname 2 (12/31/14 14:41:57): with them all?
Screenname 1 (12/31/14 14:41:57): yes
Screenname 2 (12/31/14 14:42:16): oh wow
Screenname 2 (12/31/14 14:42:32): who is the most fun to play with?
Screenname 1 (12/31/14 14:42:45): all…lol
Screenname 2 (12/31/14 14:42:54): lol
Screenname 2 (12/31/14 14:43:01): what u like to do best?
Screenname 1 (12/31/14 14:43:25): cum on them
Screenname 2 (12/31/14 14:43:46): beautiful
Screenname 2 (12/31/14 14:43:48): wow
Screenname 2 (12/31/14 14:43:54): I need to chat with u live!!!
Screenname 1 (12/31/14 14:44:04): only play live with others who r live
Screenname 2 (12/31/14 14:44:04): when is gf going out?
Screenname 2 (12/31/14 14:44:35): oh ok
Screenname 1 (03/15/15 12:28:19): hi..any good ["Application A"][2]
Screenname 2 (03/15/15 13:15:18): I wish mate
Screenname 1 (05/23/15 12:44:35): any ["Application A"]??
Screenname 2 (05/23/15 12:45:17): looking mate – no luck at mo
Screenname 1 (05/23/15 12:45:29): same
Screenname 2 (05/23/15 12:45:55): still playing with gf kids?
Screenname 1 (05/23/15 12:46:02): :)
Screenname 2 (05/23/15 12:46:15): V nice

---

[2] The actual name of "Application A" is known to law enforcement. "Application A" remains active and disclosure of the name of the application would potentially alert its users to the fact that law enforcement action is being taken against users of the application, thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the application will be identified herein as "Application A." "Application A" will be further explained later in this affidavit.

16.     Part of the investigative referral package also included Screenname 1 Skype account information.  These records included the IP address used by Screenname 1 when the chat with Screenname 2 began.  I learned this IP address was assigned to the Bee Line Cable Company based out of Madison, Maine, but could not obtain subscriber information for the IP address for the date and time in question as Bee Line Cable only retains this information for up to 12 months.  The records also included the IP address used when the Skype account was created and showed the account as having been created in September 2013.  This IP address was also assigned to Bee Line Cable therefore IP subscriber information could not be obtained.  The records showed the current email address for the account as Screenname 1@YAHOO.COM.  I submitted a request to Yahoo! for information associated with the email account and learned that it had been registered in August 2013 using the same IP address as the one used to register the Screenname 1 Skype account. There had also been no logins to the account in the last year.  The records also showed the account had been deactivated on December 4, 2015 at 4:02AM GMT. In the 'Alternate Communication Channels' section of the Yahoo! response, I noted what appeared to be a phone number of 954-650-3413.  Investigation into this phone number revealed it utilized Verizon Wireless service so I submitted a request to Verizon Wireless for records associated with the phone number and learned the phone number was assigned to a business identified as the Bridgeside Market Place with a physical address of 193 Rowe Road, Skowhegan, Maine.  The name Tracy Kruse was also listed as a contact on the account.  I conducted record checks of the address and noted Christopher Kruse associated with it.  At this point, I recalled Detective Canarr's investigation into Kruse the year prior and recalled Kruse

19

telling us he lived in Skowhegan and that he owned a small general store in Norridgewock, Maine. I recalled that Kruse was released from jail the evening of December 3, 2015 and that according to Yahoo!'s records, the Screenname 1 account had been deactivated on December 4, 2015 at 4:02AM GMT.

17.     Based on the foregoing, I believed it probable that Kruse was the user of the Screenname 1 account and contacted Detective Canarr about my findings in February 2017. Detective Canarr advised me that he had obtained a search warrant for Kruse's phone last year, but that he had been unable to get any information from it as it was locked. Detective Canarr also advised me he still had the phone in evidence and he confirmed the telephone number of this phone matched the telephone number associated with the Screenname 1 account in the records provided by Yahoo!. Sometime shortly after this conversation with Detective Canarr, I learned from the HSI Cyber Crimes Center (C3) that technological advancements had made it possible to bypass the passcode on the iPhone 6. I contacted Detective Canarr and offered to inquire with C3 about the iPhone unlock if he still wanted to examine the phone seeking evidence of the attempted visual sexual aggression against a minor. Detective Canarr was interested and I contacted C3 who advised me to send them the phone along with a valid search warrant and they would begin the attempts to unlock the phone. C3 advised they already had several phones to unlock and it would likely be several months before they got to Kruse's phone. I sent the phone to C3 in April 2017 so they would have it on hand when they were ready to begin the examination. In July 2017, C3 advised me they were ready to examine the phone and requested the warrant. Detective Canarr applied for and obtained a second state search warrant for the phone authorizing it to be unlocked and searched for evidence pertaining to the possession and

20

dissemination of child obscenity. I forwarded the warrant to C3 and received the data extraction

from the phone in September 2017. The raw phone extraction provided by C3 still needed to be

processed forensically so it was turned over to Detective Sergeant Brent Beaulieu of the Bangor

Police Department for forensic examination. Sergeant Beaulieu provided me and Detective

Canarr a disc containing the forensic examination results on October 16, 2017.

  18. I reviewed the disc and noted the Screenname 1 Skype account and the

Screenname 1@YAHOO.COM email account were listed as accounts on the phone. The phone

also contained reference to a Facebook account associated with the name "Chris Kruse" and the

email address clkruse1@yahoo.com. In addition, I located several text messages which indicated

Kruse to be the user of the phone. On June 26, 2015, a text was sent which read in part, "Hi

Rick…this is Chris Kruse with the Skowhegan 12u team…looking to see if you guys are

interested in a scrimmage next week…" On June 1, 2015, a text was sent which read in part, "Hi

Doug…this is Chris Kruse…" On June 24, 2015, the text "193 Rowe Rd, Skowhegan, ME

04976" was sent in response to someone asking where to mail papers. In addition to the data

recovered from the phone indicating Kruse was the user, Kruse had this phone in his possession

at the time of his arrest in December 2015, he had been using it to coordinate the sexual

encounter with the mother and boyfriend in Bangor, and he knew the passcode to the phone as I

watched him unlock it in order to gain access to its contents while he was speaking with us.

  19. I also reviewed the Skype chats recovered from the phone and noted the majority

centered on the sexual abuse of children and contained references to "Application A". Further

investigation into "Application A" revealed it to be the subject of an ongoing investigation by

HSI Phoenix, Arizona. I spoke with the case agent in Phoenix and learned that in October 2015,

HSI Phoenix began conducting undercover operations on an Internet-based video conferencing application used by persons interested in exchanging child pornography and/or sexually abusing children. To date, over 80 search warrants have been issued in the United States in support of "Application A" child exploitation investigations and 47 suspects living in the United States have been arrested as a result of those investigations.

20.      "Application A" is designed for video conferencing on multiple device formats. To use this application, a user downloads the application to a computer, mobile phone or other mobile device (*e.g.*, tablet or cell phone) via direct download from the company's website. Once downloaded and installed, the user is prompted to create an account. "Application A" users can invite others to an online meeting "room," which is an online location associated with a 9 or 10-digit number where each user can see and interact with the other users.

21.      When a user chooses to enter a specific meeting room, the user enters the 9 or 10-digit room number and enters the username that he wants to use on that specific occasion, which does not have to be the same as the account username. "Application A" does not require a certain number of characters for a particular username. Consequently, a user can create a name with a single special character, such as "#" or a single letter, such as "a."

22.      During a meeting, users can show a live image or video of themselves to other users through the webcam feature. Users may also display the contents of their own computer desktops to the other users in the room. The ability to display their own computer desktops allows users to show videos and photos to other users in the room. "Application A" also allows users to send text messages visible to all of the users in the room, or private messages that are similar to instant messages sent between two users.

22

23.     "Application A" permits users to conduct online video conferences for free for a limited number of minutes.  Paid subscribers can conduct online video conferences for an unlimited amount of time.  Some "Application A" users with a paid account permit their rooms to be accessed without a password such that anyone who knows the room number can enter and leave the room at any time.

24.     With this "Application A" knowledge, I reviewed the Skype messages specifically referencing "Application A" and noted approximately 73 chats referencing "Application A".  The following are several of those chats in all of which Screenname 1 is the same Skype account associated with Kruse:

25.     On April 6, 2015, Screenname 1 and Screenname 3 chatted:

Screenname 1 (6:55:42 AM): I will show boy in ["Application A"] ok
Screenname 1 (6:55:47 AM): not for long
Screenname 3 (6:55:55 AM): ok
Screenname 1 (6:55:56 AM): don't like everyone watching

26.     On April 15, 2015, Screenname 1 and Screenname 4 chatted:

Screenname 1 (7:53:02 AM): ["Application A"]??
Screenname 4 (7:53:27 AM): ["Application A" link sent]
Screenname 1 (7:53:38 AM): thx
Screenname 1 (3:07:57 PM): any other ["Application A"] going on right now? This morning was great
Screenname 4 (3:08:40 PM): no
Screenname 1 (3:09:08 PM): ok thanks…sent you a private note this morning…not sure if you want to chat here about it?
Screenname 4 (3:09:43) PM: its ok
Screenname 1 (3:10:34 PM): active here…gf has 3g 11b and 12g…all live here…always looking to cam with like minded if the opportunity presents with others that have the same
Screenname 4 (3:11:01 PM): oh yea you were in my room over the weekend I think
Screenname 1 (3:11:15 PM): yes…u remember…lol
Screenname 4 (3:11:27 PM): lol
Screenname 1 (3:11:56 PM): always looking for same…just tough to weed out fakes

23

Screenname 4 (3:12:39 PM): no access here but love tp prv out on ["Application A"] and share vids

Screenname 1 (3:13:59 PM): ok…if you run across any let me know…I have no problem sharing with you when I can and appreciate the ["Application A"]

27.    On May 1, 2015, Screenname 1 and Screenname 5 chatted:

Screenname 1 (6:19:28 AM): what is your ["Application A"] again?
Screenname 5 (6:20:46 AM): we have run out bring with you
Screenname 5 (6:24:09 AM): on my own so join me
Screenname 1 (6:24:32 AM): what u got for vids…gotta find some toddler
Screenname 5 (6:24:44 AM): man with vids has gone

28.    On May 13, 2015, Screenname 1 and Screenname 6 chatted:

Screenname 6 (12:59:28 PM): wanna call me?
Screenname 1 (12:59:48 PM): usually don't use phone
Screenname 1 (1:00:00 PM): any baby to show on ["Application A"]
Screenname 6 (1:00:02 PM): you can call me. Blocked if you want
Screenname 1 (1:00:18 PM): ok
Screenname 6 (1:00:20): yeah I have baby
Screenname 6 (1:00:28): call and ill show it
Screenname 6 (1:00:32): [ten-digit number sent]

29.    On May 14, 2015, Screenname 1 and Screenname 7 chatted:

Screenname 1 (6:45:34 AM): any ["Application A"]??
Screenname 7 (6:47:59 AM): dunno
Screenname 7 (6:48:14 AM): what kind of ["Application A"] u lookon for
Screenname 1 (6:49:20 AM): ped
Screenname 7 (6:52:28 AM): try ["Application A" link] ["Application A" link]
Screenname 7 (6:52:45 AM): many more rooms as u know
Screenname 1 (6:54:46 AM): I actually have those two but no others…those are quiet now
Screenname 1 (6:54:52 AM): thank you though
Screenname 7 (7:00:21 AM): if you want, I can send you my room list later. 35ish room (some more active than others of course)
Screenname 7 (7:00:23 AM): GTG
Screenname 1 (7:00:35 AM): awesome thanks
Screenname 7 (7:00:45 AM): later today
Screenname 1 (7:00:52 AM): sounds good
Screenname 7 (9:15:19 AM): [38 "Application A" links sent]
Screenname 7 (9:15:49 AM): some maybe invalid,some need passwords which I don't have. But most I think are in use

24

Screenname 1 (11:49:44 AM): nice…thanks

     30.     On May 18, 2015, Screenname 1 and Screenname 6 chatted:

Screenname 1 (10:37:44 PM): u have password for ["Application A" link]
Screenname 6 (10:38:38 PM): no
Screenname 1 (10:38:52 PM): damn…that was a good room
Screenname 6 (10:40:26 PM): ["Application A" link sent]
Screenname 1 (10:41:49 PM): thx

     31.     On May 19, 2015, Screenname 1 and Screenname 8 chatted:

Screenname 1 (7:02:20 AM): had a great ["Application A"] last night
Screenname 8 (7:02:39 AM): dad boy vids?
Screenname 1 (7:02:54) AM: yes…nepi[3]
Screenname 1 (7:03:16 AM): luv the baby and dads

     32.     On May 19, 2015, Screenname 1 messaged Screenname 6:

Screenname 1 (03:27:07 PM): great ["Application A"] last night…thanks

     33.     On May 19, 2015, Screenname 1 and Screenname 9 chatted:

Screenname 1 (3:28:44 PM): any good ped ["Application A"]
Screenname 9 (3:41:40 PM): ["Application A" link sent]
Screenname 1 (3:42:00 PM): thanks bud

     34.     On May 22, 2015, Screenname 1 and Screenname 6 chatted:

Screenname 1 (07:50:37 PM): Friday perv ["Application A"]??
Screenname 6 (07:51:08 PM): ["Application A" link sent]
Screenname 1 (07:51:23 PM): u da man

     35.     On May 22, 2015, Screenname 1 and Screenname 10 chatted:

Screenname 1 (9:53:40 PM): having some neap fun tonight
Screenname 1 (9:53:44 PM): nepi
Screenname 10 (9:54:42 PM): oh yeah?
Screenname 1 (9:56:10 PM): looking for nepi vids…will have 11g later

---

[3] I have learned through other child exploitation investigations that "nepi" is a shorthand reference to nepiophilia which is a sexual preference for toddlers and infants.

Screenname 10 (9:56:58 PM): I am going to be ["Application A"] with a pal shortly, could ask if he minds you joining
Screenname 1 (9:57:40 PM): that would be great…it will have to be after gf goes to work…can not at the moment…does he have a live one also like me or vid?
Screenname 10 (9:58:26 PM): no live one that I know of…I have vids and think he does too
Screenname 10 (9:58:34 PM): what time you thinking?
Screenname 1 (9:59:07 PM): cool…I have a couple pals with 4yob…trying to get them…will be a couple of hours away
Screenname 10 (9:59:41 PM): lol will try and stay awake, my weekend is ending as have work tomorrow
Screenname 10 (9:59:54 PM): seeing an 11yo cunt should keep me awake though
Screenname 1 (9:59:59 PM): Ahh bummer…lol
Screenname 1 (10:00:07 PM): will try and hurry
Screenname 1 (10:00:29 PM): need to find a good nepi live
Screenname 1 (10:00:37 PM): had a dad the other day 1yo b

36.    On May 25, 2015, Screenname 1 and Screenname 11 chatted:

Screenname 1 (3:35:48 AM): ["Application A"]??
Screenname 11 (3:37:56 AM): buddy made ped ["Application A"]…come in if u want ["Application A" link sent]
Screenname 11 (4:25:57 AM): u pedodad on ["Application A"]
Screenname 1 (4:34:07 AM): yes

37.    On May 25, 2015, Screenname 1 and Screenname 12 chatted:

Screenname 1 (5:00:19 AM): that was good one
Screenname 12 (5:00:34 AM): thx! ;)
Screenname 1 (5:00:51 AM): mmmmm
Screenname 12 (5:01:08 AM): I have 40 like that one
Screenname 12 (5:01:14 AM): it's the whole series
Screenname 1 (5:01:23 AM): lets see that one…mmmmm
Screenname 12 (5:01:56 AM): one sec
Screenname 12 (5:02:05 AM): I have to change the source
Screenname 1 (5:02:12 AM): k
Screenname 12 (5:02:29 AM): hei!
Screenname 12 (5:02:44 AM): I can't put the vids here in skype
Screenname 12 (5:02:52 AM): its not safe
Screenname 1 (5:02:57 AM): make ["Application A"]??
Screenname 12 (5:03:07 AM): better
Screenname 12 (5:03:45 AM): ["Application A" link sent]
Screenname 1 (5:17:42 AM): sorry
Screenname 1 (5:17:52 AM): look for me

Screenname 12 (5:18:15 AM): hope soon

38.    On May 25, 2015, Screenname 1 and Screenname 13 chatted:

Screenname 1 (4:42:17AM): ["Application A" link sent]
Screenname 1 (4:42:20 AM): ["Application A"]
Screenname 13 (4:44:29 AM): so fucking hot…ty bro
Screenname 1 (4:51:03 AM): where u go??
Screenname 13 (4:51:31 AM): im going back hit wrong button

39.    On May 29, 2015, Screenname 1 and Screenname 6 chatted:

Screenname 1 (11:06:55 AM): any ["Application A"]??
Screenname 6 (11:14:00 AM): idk but I just slammed
Screenname 1 (11:14:28 AM): horny as hell looking for some good neap…mine are at school
Screenname 6 (11:14:41 AM): neap?
Screenname 1 (11:14:48 AM): nepi
Screenname 6 (11:14:57 AM): yeah you wanna fuck some babies?
Screenname 6 (11:15:02 AM): fuck that's hot
Screenname 1 (11:15:05 AM): fuckkkk yeahhh
Screenname 6 (11:15:15 AM): wanna ["Application A"]? I might have some
Screenname 1 (11:15:23 AM): hell yeah
Screenname 6 (11:16:32 AM): ["Application A" link sent]

40.    On June 1, 2015, Screenname 1 and Screenname 14 chatted:

Screenname 1 (4:22:10 AM): hey…any pervin going on?
Screenname 14 (4:24:51 AM): right here ;) ["Application A" link sent]
Screenname 1 (4:25:38 AM): just saw that…anyone got any live tonight?...have gf's 11yo here sleepin
Screenname 14 (4:26:12 AM): just me showing vids…
Screenname 14 (4:26:25 AM): any chance we cud 1-on-1 with ur 11yo? ;)
Screenname 1 (4:27:14 AM): yeah…will have t get another room not here…will watch some vids for a minute

41.    On June 6, 2015, Screenname 1 and Screenname 15 chatted:

Screenname 1 (7:17:36 AM): was a good ["Application A"]  yesterday…lots of vids…veryyyyyyyyy yung
Screenname 15 (7:17:59 AM): u gotta send me the ["Application A" links] when it's happening
Screenname 1 (7:18:23 AM): yeah…I was only there for short time…
Screenname 1 (7:18:27 AM): hang on
Screenname 1 (7:19:16 AM): Screenname 4

Screenname 1 (7:19:26 AM): that is the guys name who hosts the ["Application A"]
Screenname 1 (7:19:47 AM): put it in…tell him you were recommended for his ["Application A"]
Screenname 1 (7:19:59 AM): he is one of the bests

42.   On July 26, 2015, Screenname 1 and Screenname 11 chatted:

Screenname 1 (6:18:28 AM): any ["Application A"]?
Screenname 11 (10:56:44 PM): ["Application A" link sent]
Screenname 11 (10:56:49 PM): locked at moment
Screenname 1 (10:57:07 PM): thx
Screenname 11 (10:57:38 PM): let me know
Screenname 1 (10:58:23 PM): needs pw
Screenname 11 (10:58:48 PM): yep
Screenname 1 (10:59:10 PM): k
Screenname 11 (10:59:20 PM): k

43.   On August 24, 2015, Screenname 1 and Screenname 16 chatted:

Screenname 1 (1:06:07 PM): are you alone?
Screenname 16 (1:06:34 PM): in ["Application A"]
Screenname 1 (1:06:42 PM): what room
Screenname 1 (1:06:49 PM): I tried one and it was full
Screenname 16 (1:07:08 PM): retry
Screenname 16 (1:07:19 PM): ["Application A" link sent]

44.   On September 17, 2015, Screenname 1 and Screenname 17 chatted:

Screenname 17 (7:28:57 PM): I have a dad set for Saturday night
Screenname 17 (7:29:06 PM): has 6y
Screenname 1 (7:29:09 PM): pls share him too
Screenname 17 (7:29:12 PM): I will
Screenname 1 (7:29:13 PM): from omegle?
Screenname 17 (7:29:24 PM): he wants to do a 3 way with another also
Screenname 1 (7:29:29 PM): kk
Screenname 17 (7:29:34 PM): maybe we get a ["Application A"]
Screenname 17 (7:29:39 PM): is your cock out?
Screenname 1 (7:29:51 PM): whats the advantage of ["Application A"]
Screenname 17 (7:30:05 PM): everyone can easily log in…more secure
Screenname 1 (7:30:13 PM): k
Screenname 1 (7:32:03 PM): he is off line. I will share his addy with u when I have his permission
Screenname 1 (7:32:14 PM): h must be at work

28

Screenname 17 (7:32:21 PM): 1 sec
Screenname 17 (7:32:32 PM): ok
Screenname 1 (7:34:58 PM): ["Application A"] would be hot
Screenname 17 (7:35:01 PM): yes
Screenname 1 (7:35:10 PM): how old r his kids?
Screenname 17 (7:35:16 PM): 6y g
Screenname 1 (7:35:23 PM): wow
Screenname 1 (7:35:28 PM): perfect, huh?
Screenname 17 (7:35:35 PM): soooooooo nice

     45.     On October 19, 2015, Screenname 1 and Screenname 16 chatted:

Screenname 16 (8:09:54 AM): Have a crucifix at your home?
Screenname 1 (8:10:15 AM): yes gf does
Screenname 16 (8:14:55 AM): can I see?
Screenname 16 (8:18:09 AM): take and show me
Screenname 1 (8:28:39 AM): don't know where it is
Screenname 1 (8:28:39 AM): what u want me to do with it
Screenname 16 (8:30:34 AM): wank
Screenname 1 (8:30:49 AM): I need to see some kids
Screenname 1 (8:30:53 AM): so horny here
Screenname 16 (8:31:06 AM): me too dammmm
Screenname 16 (8:31:38 AM): have ["Application A"]?
Screenname 1 (8:31:50 AM): no…can't find any
Screenname 16 (8:33:13 AM): ["Application A" link sent]

     46.     In addition to the information about the investigation into "Application A", HSI

Phoenix also provided me logs previously provided to them from "Application A" as part of their

investigation.  The logs contained "Application A" links which had been confirmed by

undercover agents to be hosting child pornography.  These logs covered the May 2015 to

November 2015 period when Kruse was advertising, soliciting, and receiving "Application A"

links via Skype chats.  I compared the "Application A" links Kruse received via Skype chat to

these logs and noted two of the links Kruse received were also confirmed by the undercover

agents as having previously hosted child pornography.  Additionally, the logs showed a

"peddad" connected to an "Application A" link on May 26, 2015 using IP address 74.124.129.67 which was assigned to the Bee Line Cable Company in Skowhegan, Maine. I compared this information to the IP addresses recovered from Kruse's iPhone and noted Kruse's phone accessed the Internet through this IP address on May 12, 2015.

47.     Based on my training and experience, and what I have learned about "Application A", I believe the above-referenced Skype chats show it probable that Kruse has a sexual interest in children, specifically toddlers and infants, and that he utilized his Screenname 1 Skype account to advertise, solicit, receive, distribute, and access child pornography. I believe it probable Kruse accessed the links sent to him as he made numerous comments about the quality of the "Application A" links he received and based on the HSI Phoenix provided logs which showed Kruse received "Application A" links which had previously been confirmed to be hosting child pornography. I also believe it probable Kruse distributed child pornography when he sent another user an "Application A" link (see paragraph #38).

48.     In addition to the Skype chats referencing "Application A", I reviewed other Skype chats indicating Kruse was advertising, requesting, accessing, possessing, and distributing child pornography. They are as follows:

49.     On May 9, 2015, Screenname 1 and Screenname 15 chatted:

Screenname 1 (10:48:46 AM): fuck the links aren't playing
Screenname 1 (10:48:54 AM): give me a second
Screenname 1 (10:48:57 AM): not sure why
Screenname 15 (10:49:00): send me the link
Screenname 1 (10:49:15 AM): ok..i am running it on TOR
Screenname 1 (10:49:21 AM): but u can try it anywhere
Screenname 15 (10:49:32 AM): ok
Screenname 1 (10:49:34 AM): [TOR link sent]
Screenname 15 (10:49:44 AM): that doesn't play outside tor?

30

Screenname 1 (10:49:44 AM): can I get a taste of your little one
Screenname 1 (10:50:32 AM): cum on him for me pleaseee
Screenname 15 (10:50:42 AM): he's asleep
Screenname 1 (10:50:48 AM): damn
Screenname 15 (10:50:55 AM): sorry
Screenname 1 (10:50:58 AM): can u do it while he sleeps
Screenname 15 (10:51:21 AM): no its not a laptop
Screenname 1 (10:51:36 AM): are you able to get em to play
Screenname 15 (10:51:46 AM): who?
Screenname 1 (10:51:53 AM): I am seeing this coke whore on the side who has 2 kids
Screenname 15 (10:52:01 AM): cool
Screenname 1 (10:52:03 AM): the links
Screenname 15 (10:52:06 AM): how old r they
Screenname 1 (10:52:26 AM): she is willing to let me play for cash…lol…but she doesn't want
em telling the dad
Screenname 1 (10:52:30 AM): 4 and 6
Screenname 1 (10:52:33 AM): 4 b 6g
Screenname 15 (10:52:49 AM): you play with them?
Screenname 1 (10:52:53 AM): we have to do it so they r asleep
Screenname 1 (10:53:00 AM): touched boy
Screenname 1 (10:53:41 AM): ["Application A"] is hit or miss with the live but vids are usually
good
Screenname 1 (10:54:00 AM): fuck…need to wake boy up and feed him…mmmmmm
Screenname 1 (10:54:05 AM): does he like taste yet
Screenname 15 (10:54:27 AM): I will cum on him when I see ur 11 ok
Screenname 15 (10:54:50 AM): did you get videos to play?
Screenname 15 (10:55:05 AM): I gtg

     50.     On May 12, 2015, Screenname 1 and Screenname 18 chatted:

Screenname 1 (12:02:59 AM): any baby vids?
Screenname 1 (12:03:12 AM): perv me up…I wanna cum on her
Screenname 18 (12:03:16 AM): I don't think so, but let me look
Screenname 18 (12:03:25 AM): hold on
Screenname 1 (12:03:28 AM): k
Screenname 18 (12:05:04 AM): hold on. Trying to show you a vid
Screenname 18 (12:05:19 AM): can you see it
Screenname 1 (12:05:36 AM): yes…yeah I got this one
Screenname 1 (12:05:42 AM): looking for some new stuff
Screenname 1 (12:05:53 AM): guy had some the other day that were smoking
Screenname 18 (12:05:57 AM): I think this is the only one I have close to baby

     51.     On May 12, 2015, Screenname 1 and Screenname 15 chatted:

Screenname 1 (9:03:57 AM): trying to find some baby to get off to
Screenname 15 (9:04:18 AM): some baby?
Screenname 1 (9:04:27 AM): baby vids
Screenname 15 (9:05:18 AM): wat bout 11yo
Screenname 15 (9:05:20 AM): I wanna see her
Screenname 1 (9:05:31 AM): getting ready for school
Screenname 15 (9:05:41 AM): turn on cam and show me
Screenname 1 (9:05:53 AM): she's in her room
Screenname 15 (9:05:59 AM): turn on cam
Screenname 15 (9:06:01 AM): call her in
Screenname 15 (9:14:25 AM): dude?
Screenname 15 (9:14:27 AM): come in
Screenname 15 (9:14:31 AM): give me something her
Screenname 1 (9:17:07 AM): u ever see falko[4] vid?
Screenname 15 (9:17:15 AM): rings a bell
Screenname 15 (9:17:16 AM): show me
Screenname 1 (9:17:39 AM): I got it if u want to watch
Screenname 15 (9:17:44 AM): yeah show me
Screenname 1 (9:17:56 AM): can u get cock out
Screenname 15 (9:18:12 AM): let me see it
Screenname 15 (9:18:14 AM): or her
Screenname 15 (9:18:50 AM): come on
Screenname 1 (9:19:42 AM): u see?
Screenname 15 (9:19:49 AM): I see u
Screenname 15 (9:19:51 AM): nothing else
Screenname 1 (9:20:33 AM): get cock out
Screenname 15 (9:21:13 AM): ok im hard
Screenname 1 (9:21:36 AM): show pics of boy
Screenname 15 (9:21:39 AM): show me
Screenname 15 (9:22:00 AM): im not showing him til I see something live from u
Screenname 1 (9:22:12 AM): ok
Screenname 1 (9:22:18 AM): show your cock
Screenname 15 (9:23:34 AM): yeah I have seen this
Screenname 15 (9:23:36 AM): good stuff

52.     On May 24, 2015, Screenname 1 and Screenname 13 chatted:

---

[4] The "falko vid" likely references a video from the Falko Video Board which used to be operated on TOR. HSI was part of a multi-agency, multi-jurisdictional team which investigated and took down the website in August 2013. The Falko Video Board had at least 27,000 worldwide members and was solely dedicated to the production and dissemination of child pornography and child pornography videos produced before the board was taken down are still being traded today.

Screenname 13 (4:42:53 AM): bitch showed up without kid,,the dad has this weekend,,,thought I was gonna eat her cunt
Screenname 1 (4:43:33 AM): then why she come by?
Screenname 13 (4:43:22 AM): that's what I was thinking
Screenname 1 (4:43:33 AM): that sucks
Screenname 13 (4:43:52 AM): big time,,my mouth is watering for it
Screenname 1 (4:44:13 AM): fuck me too
Screenname 1 (4:44:20 AM): so when is your next chance
Screenname 13 (4:45:17 AM): im gonna try tomorrow,,,I need that bald cunnie
Screenname 1 (4:45:29 AM): record it
Screenname 1 (4:45:35 AM): I need to see this
Screenname 1 (4:45:48 AM): how old??
Screenname 13 (4:46:04 AM): I am thinking of looking for a crack whore with a kid
Screenname 13 (4:46:11 AM): shes 8

53.    On August 2, 2015, Screenname 1 and Screenname 19 chatted:

Screenname 1 (11:35:03 AM): can I get a dropbox[5] pw to perv a little today?
Screenname 1 (11:35:11 AM): yes it is good
Screenname 19 (11:35:34 AM): lol wut do I get
Screenname 19 (11:35:36 AM): lol
Screenname 1 (11:35:56 AM): dude trying to include you..i told him you have a boy
Screenname 1 (11:36:01 AM): getting u in
Screenname 19 (11:36:32 AM): [Dropbox username provided]
Screenname 19 (11:36:44 AM): [Dropbox password provided]
Screenname 1 (11:36:56 AM): thx

54.    On September 18, 2015, Screenname 1 and Screenname 19 chatted:

Screenname 1 (9:47:19 AM): met couple of cool dads
Screenname 19 (9:48:46 AM): Hot
Screenname 19 (9:48:56 AM): Any good stories or vids?
Screenname 19 (9:49:34 AM): Lol
Screenname 19 (9:49:54 AM): Always need a good perv bud
Screenname 1 (9:50:29 AM): A couple of live cam shows
Screenname 1 (9:50:49 AM): ["Application A"] has dried up
Screenname 19 (9:50:51 AM): Damn I would have loved to watch
Screenname 19 (9:50:59 AM): Ikr

---

[5] Through experience, I know Dropbox to be cloud storage frequently used by those trading child pornography. Once a Dropbox account is created, it can easily be accessed from any device by entering the account username and password. The user can then view the contents of the Dropbox account.

33

Screenname 1 (9:51:11 AM): We will play again soon
Screenname 1 (9:51:26 AM): He's into vid big time
Screenname 19 (9:51:58 AM): So if I gave him my db[6] he might share?
Screenname 19 (9:52:40 AM): I still been looking for live stuff lol
Screenname 19 (9:54:00 AM): Hard to find stuff I don't already have…
Screenname 19 (9:56:33 AM): Oh well
Screenname 19 (9:56:44 AM): Wyd?
Screenname 1 (9:56:44 AM): On phone
Screenname 19 (9:56:51 AM): Ok
Screenname 19 (10:09:05 AM): (rofl)
Screenname 1 (10:19:21 AM): Yeah he would be up for a he db…I lost all the pw's
Screenname 1 (10:19:40 AM): this guy has 4b 7 g
Screenname 19 (10:20:11 AM): hot he on now?
Screenname 19 (10:20:34 AM): [Dropbox username and password provided]
Screenname 1 (10:21:06 AM): cool…not yet trying to get him
Screenname 1 (10:21:17 AM): that your best one with new ones?
Screenname 19 (10:21:38 AM): That's my full one

55.     On October 19, 2015, Screenname 1 and Screenname 20 chatted:

Screenname 1 (8:15:56 AM): wanna cum with me
Screenname 20 (8:16:19 AM): yes I do, any pics or vids
Screenname 1 (8:16:23 AM): hang on
Screenname 1 (8:16:44 AM): [Dropbox link sent]
Screenname 1 (8:16:50 AM): u have any links
Screenname 1 (8:16:58 AM): can we play with your sister later
Screenname 20 (8:17:18 AM): yes
Screenname 20 (8:17:34 AM): 2 sec
Screenname 1 (8:17:58 AM): do u eat cum too
Screenname 20 (8:18:02 AM): I do
Screenname 20 (8:18:22 AM): yes I do
Screenname 1 (8:18:36 AM): fuck your ass with something
Screenname 1 (8:18:53 AM): u like vids
Screenname 20 (8:19:10 AM): yes I love it
Screenname 1 (8:19:24 AM): I have a lot more bad ones if get real pervy
Screenname 20 (8:19:50 AM): nice what is the most bad you seen ?
Screenname 1 (8:20:04 AM): baby getting fucked and raped
Screenname 20 (8:20:31 AM): oh nice, seen anyone get killed?
Screenname 1 (8:20:36 AM): one
Screenname 1 (8:20:40 AM): u like that

---

[6] Based on other investigations I have conducted and previous conversations between Screenname 1 and Screenname 19, I believe "db" is a reference to Screenname 19's Dropbox account.

Screenname 20 (8:31:53 AM): I will try!
Screenname 1 (8:32:09 AM): we will both cum so good
Screenname 1 (8:32:18 AM): remember to delete your history
Screenname 1 (8:32:23 AM): on phone and computer

56.    On October 29, 2015, Screenname 1 and Screenname 21 chatted:

Screenname 1 (4:14:04 PM): send me your links…would like to see what u have…I wont give it
out to anyone
Screenname 21 (4:14:17 PM): okk
Screenname 1 (4:14:34 PM): will give me something to lookout since gf is home…lol
Screenname 21 (4:15:00 PM): let me see wat I can do
Screenname 1 (4:15:07 PM): cool thanks
Screenname 21 (4:15:13 PM): np
Screenname 1 (4:15:19 PM): just never film me and the kids
Screenname 21 (4:15:20 PM): ok
Screenname 1 (4:15:27 PM): I have to trust you on that
Screenname 21 (4:15:29 PM): I don't know how
Screenname 1 (4:15:32 PM): ok
Screenname 21 (4:15:50 PM) : can I send u files on here
Screenname 1 (4:16:04 PM): no…
Screenname 1 (4:16:16 PM): u are better to just give me Dropbox username and pw
Screenname 1 (4:16:23 PM): that way we aren't sending anything
Screenname 1 (4:16:33 PM): I don't send anything to anyone
Screenname 21 (4:16:35 PM): do u have a dropbox
Screenname 1 (4:16:58 PM): I am putting it together…I only use others links…but I will get a
ton for u
Screenname 21 (4:17:11 PM): ok
Screenname 21 (4:18:00 PM): so you don't have an account yet
Screenname 1 (4:18:10 PM): no…
Screenname 1 (4:18:22 PM): but with your username and pw I can look at your stuff
Screenname 1 (4:19:13 PM): always clear your history also
Screenname 21 (4:19:16 PM): username email is [username and password sent]
Screenname 21 (5:00:35 PM): did it woek
Screenname 21 (5:00:39 PM): work
Screenname 1 (5:56:24 PM): yes…will talk later…mmmmmm

57.    Based on my experience in child exploitation investigations, I believe the above

chats show it probable Kruse advertised, solicited, distributed, and accessed Dropbox links

containing child pornography.  Based on the chats, I believe Kruse kept these links and the

usernames and passwords he was provided for these accounts so he could access them when he wanted to view child pornography and also to share these links with others. I also believe it probable Kruse possessed and distributed child pornography when he shared the "Falko Vid". Based on my conversation with the HSI case agent who investigated the Falko Video Board, I have learned the board was dedicated solely to the production and dissemination of child pornography and that hundreds, if not thousands, of child pornography videos have been distributed world-wide from the board. In the context of their conversations about the sexual abuse of children, I believe it probable the "Falko Vid" Kruse referenced was one of the videos that had been hosted on the Falko Video Board and therefore is child pornography.

58.     While reviewing the chats, I learned Kruse also used a laptop computer and possibly another computer to chat on Skype. On May 11, 2015, Screenname 1 chatted, "gf has access to computer". On May 12, 2015, Screenname 1 chatted, "I will be back on computer in about 10 min". On July 26, 2015, Screenname 1 chatted, "I had to delete everything I had…gf got into computer…close call…but I salvaged some history..building it back…lol". On September 28, 2015, Screenname 1 chatted, "I am on a laptop". On October 3, 2015, Screenname 1 chatted, "phone ginna die I will get to computer shortly". On October 29, 2015, Screenname 1 chatted, "just got on computer". On October 31, 2015, Screenname 1 chatted, "I am going to go to my phone Skype to try and show her to u. she will see my computer if I turn it."

59.     After reviewing the chats, I believe Kruse used the Screenname 1 Skype account to chat on his phone and his computer(s) and that many of these chats occurred in his home. The following are some chats that provide evidence of this:

37

60.    On May 10, 2015, Screenname 1 and Screenname 13 chatted:

Screenname 1 (9:59:02 AM): when u get kids again
Screenname 1 (9:59:18 AM): we gotta hook up
Screenname 13 (9:59:32 AM): as horned as I am im try this week
Screenname 1 (9:59:45 AM): fuck yeah
Screenname 1 (9:59:50 AM): what times are good for u
Screenname 13 (9:59:59 AM): I work from home to
Screenname 1 (10:00:11 AM): me too mostly...fuck yeah
Screenname 1 (10:00:25 AM): as long as gf is gone I'm good

61.    On August 2, 2015, Screenname 1: and Screenname 22 chatted:

Screenname 22 (10:46:07 AM): was that your wife?
Screenname 1 (10:46:17 AM): gf's daughter
Screenname 1 (10:46:28 AM): gf home from work soon

62.    On September 30, 2015, Screenname 1 and Screenname 16 chatted:

Screenname 1 (8:40:24 AM): I will get a pic and send it...gf home right now...I may have to
scan one in or take a pic of one...I will get to you
Screenname 1 (8:40:56 AM): so horny here
Screenname 16 (8:40:58 AM): ok...we can see in ["Application A"] and I show the last pic of gs
Screenname 1 (8:41:07 AM): yes
Screenname 1 (8:41:15 AM): when do u want to play some?
Screenname 16 (8:41:48 AM): we can do something now
Screenname 1 (8:42:10 AM): give me a few minutes to get ready and make sure gf is working in
her office
Screenname 1 (8:42:23 AM): I will message u back shortly
Screenname 16 (8:42:36 AM): ["Application A" link sent]

63.    On October 2, 2015, Screenname 1 messaged Screenname 23:

Screenname 1 (8:45:48 PM): when do u wanna play
Screenname 1 (8:45:59 PM): I have to be careful gf is home now

64.    On October 3, 2015, Screenname 1 and Screenname 23 chatted:

Screenname 1 (7:48:23 PM): phone ginna die I will get to computer shortly
Screenname 23 (8:04:36 PM): Ok u have any fun latly
Screenname 1 (8:09:53 PM): had the lil one today...gf's 11yo is here watching tv
Screenname 1 (8:10:40 PM): gf's friend brought her 6yo by for a bit...mmmmmm

38

65.    On October 28, 2017, Screenname 1 messaged Screenname 24:

Screenname 1 (10:03:55 PM): can u stroke at all on cam…I can sneak a little…Gf is home

66.    On October 29, 2015, Screenname 1 and Screenname 21 chatted:

Screenname 21 (3:56:16 PM): did ur phone die
Screenname 1 (4:06:25 PM): yes
Screenname 1 (4:06:30) PM: just got on computer
Screenname 21 (4:06:30 PM): o
Screenname 21 (4:06:34 PM): ok
Screenname 1 (4:06:35 PM): have to be careful
Screenname 1 (4:06:38 PM): gf around
Screenname 21 (4:06:42 PM): ok
Screenname 1 (4:13:13 PM): gf home

67.    On October 31, 2015, Screenname 1 and Screenname 24 chatted:

Screenname 24 (12:34:32 AM): maybe u can spend the night here in December
Screenname 1 (12:34:59 AM): what part of dec
Screenname 1 (12:35:49 AM): 11 is here but awake
Screenname 24 (12:35:58 AM): I believe it is the 5th to the 12
Screenname 1 (12:36:03 AM): she got home from a friends Halloween party
Screenname 1 (12:36:48 AM): trying to figure how I could bring 2y
Screenname 24 (12:37:42 AM): bring ur special pills
Screenname 1 (12:38:06 AM): have to have a reason she is coming with me for gf
Screenname 24 (12:38:20 AM): will it keep them asleep even if u r pounding their holes?
Screenname 1 (12:38:42 AM): kept her asleep when I fucked her mouth
Screenname 24 (12:40:16 AM): would you let me rape the 2yo in ass?
Screenname 1 (12:40:35 AM): if you were easy about it
Screenname 24 (12:40:53 AM): I want to go deep
Screenname 1 (12:41:05 AM): not sure on that…lol
Screenname 24 (12:41:21 AM): ur no fun
Screenname 1 (12:41:24 AM): lol
Screenname 1 (12:41:26 AM): sorry
Screenname 1 (12:41:42 AM): u want me to pound the boy
Screenname 1 (12:41:53 AM): will u cum on him and I can eat it off
Screenname 1 (12:42:08 AM): r u gonna cam tonight at all
Screenname 1 (12:42:11 AM): stroke?
Screenname 1 (12:44:45 AM): alright then…heading to bed

39

68.     I believe the above chats show it to be probable that Kruse accessed Skype from home. I have probable cause to believe, and I do believe, the computers used by Kruse will contain evidence of these Skype sessions and of the child pornography he advertised, solicited, distributed, received, and accessed via Skype, "Application A", TOR, and the Dropbox accounts. I believe these computers will contain forensic evidence showing Kruse used these computers to access online file storage and this evidence will show where this child pornography was stored. I also have probable cause to believe these computer(s) will contain evidence of the possession of child pornography in the unallocated or deleted space of the computer(s). I base this belief on Kruse's chat when he stated he had to delete everything he had because his girlfriend accessed his computer. Kruse goes on to say that he was able to salvage some history and that he was building it back. I believe these computer(s) will contain the evidence he deleted as it is possible for computers to retain data in unallocated space indefinitely. I also believe these computer(s) will contain evidence of child pornography in allocated space as Kruse stated he was building it (which I believe references his child pornography history and links) back and he continued to use Skype and "Application A" for at least three months after this event. Kruse also continued to share Dropbox links after this event indicating that he had probably succeeded in building his collection back up.

69.     I also reviewed the IP addresses used by Kruse's phone to connect to the Internet and noted the most common IP address used was assigned to the Bee Line Cable Company. As this IP address was assigned over two years ago, Bee Line Cable Company does not retain subscriber information for that length of time. Bee Line Cable's records of modems rented to Kruse's home do not match any MAC addresses of the wireless networks accessed and cached

40

by his iPhone. Bee Line Cable Company was able to confirm that Kruse does utilize their Internet service at his residence located at the SUBJECT PREMISES and has had service there since December 2009.

70.     A check of publicly available databases lists Christopher Kruse and Tracey Kruse as the co-owners of the SUBJECT PREMISES.

71.     A check with the Division of Motor Vehicles on or about November 2, 2017 revealed that Kruse resides at the SUBJECT PREMISES. The Division of Motor Vehicles records also showed two vehicles registered to Kruse with the SUBJECT PREMISES listed as the registration address. They are: a black 2007 Chevrolet Tahoe bearing Maine license plate 7992TN registered to Kruse and a white 2012 GMC Yukon bearing Maine license plate 651AMS co-registered to Kruse and Tracey Kruse.

72.     A search of the Clear information database (a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, etc.) was conducted for Kruse. These public records indicated that Kruse's current address is the SUBJECT PREMISES.

73.     On October 30, 2017, I conducted surveillance of the SUBJECT PREMISES, but was unable to view the residence as it is set back far from the road with the only access being a single-lane driveway winding through a heavily-wooded area.

74.     A search of open source information from the Internet regarding Kruse revealed a website listing him as the Program Director for the Central Maine Rebels 13U baseball team with telephone number 954-650-3413.

75.     The investigation into Kruse has revealed him to be married with two older male

children (high school and college age).  There is no evidence of Kruse having access to 3

younger children, two of whom are girls, or having a girlfriend as he states in his chats.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ADVERTISE, TRANSPORT, DISTRIBUTE, RECEIVE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

76.     Based on my previous investigative experience related to child exploitation

investigations, and the training and experience of other law enforcement officers with whom I

have had discussions, I know there are certain characteristics common to individuals who

advertise, solicit, transport, distribute, receive, possess, and/or access with intent to view child

pornography:

     a.     Such individuals may receive sexual gratification, stimulation, and

satisfaction from contact with children, or from fantasies they may have viewing children

engaged in sexual activity or in sexually suggestive poses, such as in person, in

photographs, or other visual media, or from literature describing such activity.

     b.     Such individuals may collect sexually explicit or suggestive materials in a

variety of media, including photographs, magazines, motion pictures, videotapes, books,

slides and/or drawings or other visual media.  Individuals who have a sexual interest in

children or images of children oftentimes use these materials for their own sexual arousal

and gratification.  Further, they may use these materials to lower the inhibitions of

children they are attempting to seduce, to arouse the selected child partner, or to

demonstrate the desired sexual acts.

c.      Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly.  Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e.      Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[7]

---

[7] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors

f.      Such individuals also may correspond with and/or meet others to share

information and materials, rarely destroy correspondence from other child pornography

distributors/possessors, conceal such correspondence as they do their sexually explicit

material, and often maintain lists of names, addresses, and telephone numbers of

individuals with whom they have been in contact and who share the same interests in

child pornography.

g.      Such individuals prefer not to be without their child pornography for any

prolonged time period.  This behavior has been documented by law enforcement officers

involved in the investigation of child pornography throughout the world.  Thus, even if

Kruse uses a portable device (such as a mobile phone) to access the internet and child

pornography, it is more likely than not that evidence of this access will be found in his

home, the SUBJECT PREMISES, as set forth in Attachment A.

77.      Based on the following, I believe that Kruse, who resides at the SUBJECT

PREMISES, likely displays characteristics common to individuals who advertise, solicit,

transport, receive, distribute, possess or access with intent to view child pornography.  For

example, Kruse:

- Allegedly offered $200 to include a three year old child in a sex act.
- Allegedly claimed to possess child pornography on his computer.
- Chatted with numerous users online regarding the sexual abuse of infants and toddlers.
- Received numerous links after soliciting child pornography.

---

and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting
cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370–
71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010).)

44

- Appeared to visit these child pornography links based on his comments about the links.
- Appeared to keep these links for his own sexual gratification and to share with others.
- Solicited and received child pornography links numerous times while home.
- Mentioned his need to be cautious several times because his girlfriend was home.
- Chatted about having to delete everything he had as his girlfriend accessed his computer.
- Chatted about salvaging some history and building it back up after this incident.
- Screen-shared a child pornography video he possessed on his computer.
- Solicited, advertised, received, distributed, possessed, and accessed with intent to view child pornography from at least March 2015 through at least November 2015.

## REQUEST FOR SEALING OF APPLICATION/AFFIDAVIT

78.      It is respectfully requested that this Court issue an order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the SUBJECT PREMISES).  Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation and not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through forums.  Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on this continuing investigation and may jeopardize its effectiveness by alerting potential targets to the existence and nature of the investigation, thereby giving them an opportunity to flee, or to destroy or tamper with evidence.

45

## CONCLUSION

79.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A.  I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

80.     I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process.  For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises.  Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Gregory Kelly
Special Agent
Homeland Security Investigations

Sworn and subscribed before me this 27 th day of November, 2017.

JOHN C. NIVISON
UNITED STATES MAGISTRATE JUDGE

46

## ATTACHMENT A

## DESCRIPTION OF LOCATIONS TO BE SEARCHED

The entire property located at 193 Rowe Road, Skowhegan, Maine 04976, including the residential building, any outbuildings, and any appurtenances thereto (the SUBJECT PREMISES).  The SUBJECT PREMISES is a two-story, single-family residence which is white in color with an asphalt shingle roof.  The second-story windows are gabled.  There is also an attached three-car garage.  The driveway is paved and there is a black mailbox bearing the number "193".



The two vehicles registered to Kruse which are identified as a black 2007 Chevrolet Tahoe bearing Maine license plate 7992TN registered to Kruse and a white 2012 GMC Yukon bearing Maine license plate 651AMS co-registered to Kruse and Tracey Kruse.

The person of Christopher Kruse (year of birth: 1968) provided that this person is located at the SUBJECT PREMISES and/or within the District of Maine at the time of the search.

1

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 2251 and 2252A:

1.  Computers or storage media used as a means to commit the violations described above.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

2

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e.  evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  contextual information necessary to understand the evidence described in this attachment.

3

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography and child erotica.

5. Records, information, and items relating to violations of the statutes described above including:

    a. Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, 193 Rowe Road, Skowhegan, Maine 04976, including utility and telephone bills, mail envelopes, or addressed correspondence;

    b. Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

    c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

    d. Records and information relating to the sexual exploitation of children, including correspondence and communications between users of "Application A";

    e. Records and information showing access to and/or use of "Application A"; and

    f. Records and information relating or pertaining to the identity of the person or persons using or associated with the Screenname 1 username.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

4

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.